UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

JOHN L.[1],                           )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )          CIVIL NO.  4:19cv18
                                      )
ANDREW SAUL,                          )
Commissioner of Social Security,      )
                                      )
          Defendant.                  )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Insurance (SSI), as provided for in the Social Security Act. 42 U.S.C. § 423(a), § 1382c(a)(3).  Section 405(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

---

[1]  To protect privacy, Plaintiff's full name will not be used in this Order.

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

    1.      The claimant meets the insured status requirements of the Social Security Act

through December 31, 2019.

2.     The claimant has not engaged in substantial gainful activity since March 31, 2014, the alleged onset date (20 CFR 404.1571*et seq*., and 416.971 *et seq*.).

3.     The claimant has the following severe impairments: degenerative disc disease of the lumbar spine and bilateral carpal tunnel syndrome (CTS) (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that the claimant can never climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs, and can occasionally balance, stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to vibration. The claimant can frequently handle and finger bilaterally.

6.     The claimant is capable of performing past relevant work as a tool and die maker (DOT # 601.260-010). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2014, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 14 - 20).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on August 23, 2019. On November 29, 2019, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff

replied on December 13, 2019. Upon full review of the record in this cause, this court is of the view that the ALJ's decision must be remanded.

A five-step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step four was the determinative inquiry.

In a 2015 report to SSA, Plaintiff explained that from 2005-2013 he "worked various labor positions, essentially casting dies and running a manual lathe machine" (Tr. 223). He used machines, tools, and equipment, but he did not use technical knowledge or skills or do any writing, complete reports, or perform any similar duties (Tr. 223).

Plaintiff reported spending the majority of his day standing and walking, reaching, stooping handling, and lifting 50 pounds frequently and 100 pounds occasionally (Tr. 223). He did not supervise or lead other employees (Tr. 223). He had a high school education but no vocational or technical training (Tr. 222). At the administrative hearing he testified that he

worked as a tool and die maker running a manual lathe (Tr. 77-78). He explained that depending on the task required, some days he stood all day while other days he sat part of the time (Tr. 78-79). He estimated that he lifted 40 to 50 pounds and occasionally a "big die" (Tr. 78). He was fired when his health deteriorated, and he could no longer tolerate the physical demands of the job and incurred too many absences (Tr. 80).

An administrative hearing was held on December 13, 2017 (Tr. 62-112). Plaintiff testified that, prior to his alleged onset of disability, he did not always get treatment because he did not have insurance (Tr. 80). He also explained that he was fired from his last job because of his condition (Tr. 80-81). He said he could no longer do the job because of pain and he was frequently ill which caused him to be absent (Tr. 80-81). He related his various diagnoses and tried to explain to the ALJ his understanding of the effect Hepatitis C had on his body (Tr. 81). He reported being told he had stage four liver disease, and he had symptoms that included fatigue, achiness, muscle and joint pain, and nausea (Tr. 81-82). While he felt better after completing the most recent treatment, he still had symptoms. He was unsure if some of his aches and pains were attributable to arthritis, but he still did not feel well overall (Tr. 82). He described doing minimal routine daily activities (Tr. 97-99).

Plaintiff described the pain in his back as being like a toothache (Tr. 85). Treatment had been unsuccessful, and medications caused side effects like tiredness and trouble thinking (Tr. 85-86). Injections in his back helped but only for a couple of weeks (Tr. 94). He had tried taking medication for depression, but he had side effects from that medication as well and had to stop taking it (Tr. 86). He had tried several medications and was looking for something new.

The ALJ called upon a vocational expert (VE) to testify about jobs and the impact of

certain limitations on a person's ability to perform jobs that exist in significant numbers in the national economy (Tr. 102-09). The VE categorized Plaintiff's past work as a tool and die maker as a medium exertional level job performed at the skilled (SVP 8) level (Tr. 102-03). The ALJ did not ask the specific requirements of the job or the differences between how Plaintiff performed the job and how it was generally performed. In response to various hypothetical questions, the VE offered his opinion of whether a person with certain limitations could perform the job either as Plaintiff performed it or as it is described in the Dictionary of Occupational Titles (DOT) (#601.260-010)4 (Tr. 103-06).

The VE testified that an individual capable of medium work who could never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; and occasionally balance, stoop, kneel, crouch, and crawl; could tolerate no concentrated exposure to vibration; and could frequently handle and finger bilaterally and could perform Plaintiff's past relevant work (PRW) both as he performed and as described in the DOT (Tr. 102-03). Occasional handling and fingering eliminated jobs (including the PRW) at the medium exertional level and reduced the light occupational base to one job (Tr. 103). Even if Plaintiff could perform the full range of light work, the skills acquired in his past work would not transfer according to the VE (Tr. 103-04). Limitations precluding all work activity included being off task more than 20% of the workday and two to three absences per month (Tr. 103-05).

In a Disability Report - Field Office (Ex. 1E) dated February 9, 2015, following a face-to-face meeting with Plaintiff, an SSA employee noted that, during the disability interview, Plaintiff had difficulty concentrating (Tr. 218). The report describes Plaintiff as "reasonably well groomed . . . somewhat lethargic, but [] in generally good spirits." During the interview, he

"displayed difficulty with memory" but the encounter was otherwise unremarkable (Tr. 218). In a separate report on the same day, Plaintiff explained that he was unable to work due to hepatitis C, liver pain, joint pain, muscle pain, difficulty staying awake, and depression (Tr. 221). He confirmed that he stopped working due to his condition (Tr. 221). In a narrative, Plaintiff explained that his hepatitis had not responded to treatment and had worsened over the years (Tr. 226). His joints ached, he did not feel rested after sleeping, and at times he could not get out of bed (Tr. 226). He had intense back pain and fatigue. He was confused sometimes, felt depressed, and did not think clearly (Tr. 226). He estimated having just a couple of good days in the previous couple years (Tr. 226).

In the same February 9, 2015 report, Plaintiff's girlfriend of 30 years commented on his condition (Tr. 226). She said he was "very irritable." She reported memory deficits, depressive symptoms that he would not admit, difficulty getting out of bed, hair and tooth loss, and fatigue (Tr. 226). She described a decrease in activity and stamina and said, "He is exhausted mentally, physically, emotionally." She expressed frustration over his doctors' lack of progress or interest in addressing his difficulties other than slowing the damage to his liver due to the Hepatitis C (Tr. 226).

On February 25, 2015, Plaintiff completed a report describing his symptoms and limitations (Tr. 220-27). Plaintiff reported that he was tired after running a few errands, he spent most of his time lying down and would fall asleep frequently (Tr. 228). He was raising two grandsons with his long-time girlfriend who was primarily responsible for their care (Tr. 229). In fact, his girlfriend did all of the cooking and many of the chores. Although Plaintiff could perform some tasks, he could sustain activity for only a limited amount of time and could not do anything

heavy or strenuous (Tr. 230). The form asks for hobbies and interests, and Plaintiff listed fishing, hunting, boating, and camping but indicated he did those things only when his illness permitted and could not do them nearly as much as previously (Tr. 232). On a checklist portion of the form, Plaintiff noted difficulties with most physical activities due to pain and fatigue and also noted a poor ability to follow written instructions (Tr. 233).

In a report dated February 26, 2015, Plaintiff's girlfriend of 30 years explained that Plaintiff spends a lot of time in bed due to fatigue caused by Hepatitis C and generally corroborated his reports (Tr. 237). She explained that he can follow written instructions if someone sits with him and assists him, and she described him being irritable "all the time" and being "very discouraged" (Tr. 242-43). Overall, his girlfriend's report elaborates on Plaintiff's minimal description of his difficulties by fleshing out his problems with memory, concentration, fatigue, and performance of normal activities and describing the impact those difficulties have on his mental health (Tr. 244).

On October 22, 2015, Plaintiff completed another disability report, and the field office also entered a "report" into the record despite having no contact with Plaintiff (Tr. 245-46). (Exhibit 5E). In the October 2015 report, Plaintiff added hypertension and carpal tunnel syndrome to his list of disabling impairments (Tr. 248). In a Disability Report in April 2016, Plaintiff added stage four liver disease as an additional disabling impairment (Tr. 260). He explained that he was more fatigued, his pain was worse, he was less active, he napped daily, he had difficulty getting out of bed, and he was always tired (Tr. 265).

Plaintiff first sought care from Lisa Nelson, NP, at HealthLinc, on May 7, 2015 (Tr. 304). He reported a history of Hepatitis C virus (HCV) and generally not feeling well, back pain, joint

pain, and right wrist pain. He had chronic right flank pain and urinary urgency, bilateral arm pain with occasional weakness, chronic back pain, fatigue and lack of energy, excessive sleeping (worsening), and generalized aches and pains. NP Nelson noted symptoms of situational depression. On exam, she observed Plaintiff to have an abnormal heartbeat and a positive Phalen's test (Tr. 304). She assessed him with abnormal heart sounds, Hepatitis C virus, lumbago, carpal tunnel syndrome, and fatigue (Tr. 304-05). She ordered lab work, an EMG, imaging of his spine, an echocardiogram, and prescription medications (Tr. 306-07). A May 20, 2015 EMG was mildly abnormal and was not diagnostic of his upper extremity symptoms (Tr. 365).

When Plaintiff returned to NP Nelson on May 22, 2015, he was still experiencing severe lower back pain (Tr. 302). His lab work revealed cannabis use which limited his treatment options. NP Nelson ordered an MRI and referred Plaintiff to a gastroenterologist and pain management specialist for further evaluation and treatment (Tr. 302). June 2, 2015 HealthLinc records noted that Plaintiff had systemic symptoms of Hepatitis C (Genotype 1a) that was non-responsive to interferon (Tr. 310). No significant treatment was initiated, and he was to follow-up in six months.

A July 2015 lumbar MRI showed mild to moderate degenerative spondylosis (Tr. 345). There was a tiny central disc protrusion with moderate to severe bilateral facet arthrosis at L4-L5, and moderate bilateral facet arthrosis at L5-S1 (Tr. 345).

In July 2015, Plaintiff presented to the Centers for Pain Control (CPC) following an emergency department visit at Porter Regional Hospital for serious, worsening back pain (Tr. 350-52). At CPC, Plaintiff saw Adrian Sonevytsky, M.D., (Exhibit 5F) who noted that Plaintiff had a medical history significant for high blood pressure, high cholesterol, depression,

rheumatoid arthritis, hepatitis, and liver problems (Tr. 313). His back pain had progressed over the previous three years to the point it was "quite debilitating" and causing "severe functional limitations" (Tr. 313). Previous treatment with over-the-counter pain medications, muscle relaxants, anti- inflammatories, Vicodin, and Norco provided only mild to moderate relief. Other previous medications either did not help or caused significant side effects. He had also engaged in extensive home physical therapy (Tr. 314). Dr. Sonevytsky observed Plaintiff having difficulty ambulating, guarding, and exhibiting antalgic behavior. He had no focal neurologic deficit but expressed severe pain with range of motion maneuvers of the lumbar spine. The doctor noted that the July 2015 MRI of Plaintiff's lumbar spine showed significant multi-level degenerative disc disease and moderate multi-level degenerative joint disease (Tr. 315). He diagnosed lumbosacral spondylosis without myelopathy, lumbar degenerative disc disease (DDD), displacement of lumbar intervertebral disc, and sciatica (Tr. 316). Dr. Sonevytsky described Plaintiff's pain as discogenic/radicular in nature and explained that it was caused by a combination of lumbar spondylosis, degenerative disc disease, and sciatica. He noted that Plaintiff had not responded to the usual conservative measures (*i.e.* physical therapy, rest, activity modification, and medication management) and interventional treatment was indicated. Plaintiff declined surgery, so an epidural steroid injection was planned. He was also prescribed Ultram and Norco (Tr. 316).

On August 25, 2015, Dan Cha, M.D., a pain specialist at CPC, performed a lumbar transforaminal epidural (diagnostic) that afforded suboptimal relief (Tr. 318, 320). When Plaintiff returned to CPC in September, he was ambulating with difficulty and still exhibiting guarding and antalgic behavior. Although he had no focal neurologic deficit, he had severe pain on range of motion maneuvers of the lumbar spine and his straight leg raise (SLR) test was positive bilaterally

(Tr. 320). A repeat diagnostic transforaminal epidural injection was planned and Norco added for pain (Tr. 320). Thereafter, in September 2015, Plaintiff was admitted to Porter Regional Hospital emergency department due to an accidental overdose of norflex, amitripty1ine, gabapentin, lisinopril, and Norco (Tr. 325). (Exhibit 6F). Returning to CPC in November 2015, Plaintiff saw Chetan Puranik, M.D. (Exhibit 7F) (Tr. 383- 85). The physical examination remained unchanged, including the positive SLR (Tr. 383). Norco was not controlling his pain, so Percocet was prescribed in its place, and Plaintiff was also given a TENS unit (Tr. 384).

In December 2015, Plaintiff returned to HealthLinc where he saw Amanda Mathews, M.D., at a six-month follow-up appointment for monitoring of his pain and other medical conditions (Tr. 386-89). Dr. Matthews referred him to a gastroenterologist (Tr. 389).

Plaintiff underwent a lumbar transforaminal epidural (therapeutic) on December 17, 2015 (Tr. 390) (Exhibit 9F). Eleven days later, on December 28, 2015, Dr. Puranik said Plaintiff reported excellent relief from the transforaminal procedure (Tr. 394). He described decreased pain and increased functional capacity with decreased need for analgesic medications. However, Dr. Puranik also reported that Plaintiff continued to have persistent axial pain with prolonged standing or sitting and excessive activity (Tr. 392). He observed Plaintiff to still have guarded ambulation and guarding with some activities and significant pain with ROM maneuvers of the lumbar spine. The straight leg testing was negative in both legs. Dr. Puranik's assessment was lumbosacral spondylosis without myelopathy, degenerative disc disease of the lumbar or lumbosacral spine, displacement of lumbar intervertebral disc, and spinal stenosis of the lumbar region (Tr. 392-93). He believed Plaintiff had responded very well to the epidural steroid injections and was "therapeutically optimized with regard to this type of treatment." Dr. Puranik

recommended a diagnostic block to guide future treatment potentially including focused physical therapy, therapeutic facet injections, and radiofrequency ablation (Tr. 393). Dr. Patel performed a diagnostic lumbar medial branch block (#1) on January 3, 2016 (Tr. 425).

Later in January 2016, Plaintiff saw NP Nelson to follow up on treatment for other conditions including his blood pressure for which he had ran out of medication. (Tr. 471). Amitriptyline was not helping with sleep, and his arthritis was flaring. He was taking Percocet and tramadol as prescribed by his pain management physician (Tr. 471). He reported feeling tired and depressed and having insomnia (Tr. 471). He was started on Cymbalta for anxiety and depression (Tr. 473).

Also in January 2016, Phoxay Phetthongsy, D.C., at CPC, evaluated Plaintiff and recommended he begin chiropractic treatment (Tr. 403). Dr. Phetthongsy's evaluation revealed pain with palpation in several areas, dysfunction and reduced range of motion, and some weakness (Tr. 403). The chiropractor described Plaintiff's condition as "severe" and his prognosis as "fair" (Tr. 403). Subsequent treatment notes show similar findings, although Plaintiff showed some response to treatment (Tr. 404-05, 408-10). Dr. Phetthongsy repeatedly observed Plaintiff to have an abnormal posture with a "forward head" and a "protracted shoulder" (Tr. 404-05, 408-10, 444-47, 449).

Plaintiff also saw his pain management doctor at CPC in January 2016. Dr. Cha noted that the lumbar epidural steroid injection resulted in some moderate improvement in Plaintiff's pain symptoms, but he continued to have persistent chronic pain in his lumbar spine (Tr. 406). Dr. Cha also commented on Plaintiff's deterioration after a previously recommended diagnostic lumbar medial branch block was denied by his insurance carrier and he underwent the therapy that the

carrier required in place of the recommended treatment. The doctor note that "each session of therapy has caused severe worsening of his pain symptoms." On exam, Plaintiff had moderate-to-severe pain with flexion and extension of the lumbar spine that caused pain and severe functional limitations (Tr. 406). The doctor again recommended a diagnostic lumbar medial branch block because Plaintiff had "failed to respond to any therapy that has been done [and i]t is unlikely that he will continue to achieve any relief with the therapy which was recommended by his insurance." (Tr. 406). Dr. Cha again changed Plaintiff's pain medication; he added MS Contin for breakthrough pain not controlled by other narcotic medications (Tr. 407).

In February 2016, Plaintiff sought treatment from Ranga Kota, M.D., for his Hepatitis C (Tr. 401- 02). Plaintiff saw Dr. Kota only a handful of times in 2016 and early 2017, and treatment notes reveal little. Dr. Kota's notes include FIBROSpect II testing that quantifies the extent of damage to Plaintiff's liver caused by the Hepatitis C virus (Tr. 454). Plaintiff's FIBROSpect II Index score was 96 out of 100 which represents a 98.1% chance of Plaintiff having a Metavir score of F2-F48 (Tr. 454). These scores are indicative of cirrhosis of the liver. A June 2017 entry in Dr. Kota's note mentions Plaintiff being warned of the risks associated with taking pain medication while undergoing treatment for hepatitis (Tr. 451). After undergoing treatment, lab results from June 2017 appear to show no detectable Hepatitis C virus in Plaintiff's blood (Tr. 453).

Plaintiff saw NP Nelson on February 22, 2016, for follow-up treatment for his chronic conditions and to specifically address concerns about his deteriorating mood (Tr. 465). NP Nelson noted his ongoing treatment problems with carpal tunnel syndrome, fatigue, hepatitis C virus, and lumbago (Tr. 465). He reported being unable to get out of bed for three days in a row with no

improvement in his mood since the last visit (Tr. 465). The medication had made him more tired (Tr. 465). NP Nelson assessed hypertension, drug-induced erectile dysfunction (related to pain medication), fatigue, and mild depression (Tr. 467).

In February and March 2016, chiropractic treatment notes indicate that Plaintiff's condition was responding to treatment, but the relief was temporary (Tr. 444-49). Dr. Phetthongsy continued to observe a negative SLR bilaterally along with some pain, dysfunction, and reduced range of motion. Describing Plaintiff's progress as "static," he said Plaintiff had reached maximum benefit from treatment and recommended as-needed appointments thereafter (Tr. 444).

July 2016 notes from CPC indicate that Plaintiff was enrolled in physical therapy due to another procedure being denied by his insurance carrier because he had not undergone physical therapy (Tr. 442). However, he was having difficulty engaging in the insurance required therapy, and his doctor recommended other treatment (Tr. 442). Physical examination elicited moderate to severe pain but no evidence of neurological deficit as in prior visits (Tr. 442). The doctor noted taut palpable bands in the low back and palpation elicited increased pain (Tr. 443). Physical therapy, pain medications, and activity modification such as stretching and exercise had not provided adequate relief. MS Contin was also ineffective and accordingly was discontinued and replaced with Percocet (Tr. 443).

In November 2016, Plaintiff reported to doctors at CPC that his pain was about the same (Tr. 439). The prior lumbar epidural steroid injection provided only short-term reduction of his pain and other symptoms. He also continued to have persistent pain in his joints. His condition did not improve with physical therapy. Physical examination findings were consistent with prior visits except his pain was progressively getting worse. A diagnostic lumbar medial branch block

was recommended (Tr. 439). Clinic records indicate Plaintiff was utilizing Medicaid (Tr. 441).

In February 2017, Plaintiff returned to Dr. Cha following the medial branch diagnostic block (Tr. 422). The procedure provided complete relief for six hours, but the pain slowly and steadily returned back to the 9/10 level pre-procedure baseline. Dr. Cha called Plaintiff's back pain unchanged and stable (Tr. 422). Exam findings were nearly identical to the previous visit and the diagnoses remained the same. Dr. Cha planned a repeat diagnostic block (Tr. 423) that was performed March 2, 2017 (Tr. 420).

In April 2017, Plaintiff saw Dr. Cha for follow up after a second diagnostic block of the medial branch nerves (Tr. 417). As before, the block afforded very short-term (1-2 hours) relief, but Plaintiff's pain slowly and steadily returned back to the baseline "8/10" level (Tr. 417). Dr. Cha considered Plaintiff's condition essentially unchanged since before the procedure. Examination findings were the same as previous visits and were notable for pain on ROM maneuvers without neurological deficit (Tr. 417-18). He again noted Plaintiff's failure to respond to conservative therapy (*i.e.* physical therapy, rest, activity modification, medication management). Dr. Cha concluded that the two "successful" blocks reliably demonstrated that Plaintiff's pain was caused by "facet arthropathy" that should respond to treatment with radiofrequency ablation. In the meantime, Dr. Cha adjusted Plaintiff's pain medications to palliate his pain until further interventions provided relief.

Plaintiff also sought treatment at HealthLinc in April 2017 for his other chronic conditions, specifically, to address concerns about his deteriorating mood (Tr. 461). He reported being "more snappy than normal" with significant irritability and his family said he needed Xanax (Tr. 461). His symptoms had not resolved with Wellbutrin. He was not sure gabapentin was

helping his pain and he was having withdrawal symptoms after discontinuing Percocet (Tr. 461). His wrist symptoms were improving (Tr. 461). Plaintiff scored an 18 on the PHQ-9, and NP Nelson added Buspar to his medication regimen (Tr. 463).

When he returned to HealthLinc in May 2017, Plaintiff reported he had stopped taking medication for depression/anxiety, and he recently stopped taking Percocet and was taking Norco and tramadol in its place (Tr. 457) (Exhibit 15F). He believed the Percocet was precipitating his mood issues. He felt "blah" and without energy, and he was having trouble sleeping at night (Tr. 457). His medication regimen included Gabapentin, Lisinopril, Ribasphere, Tramadol, Viagra, and Viekra (Tr. 458). NP Nelson added a diagnosis of primary insomnia and prescribed a trial of amitriptyline (Tr. 459).

On June 18, 2017, Dr. Cha performed a lumbosacral radiofrequency ablation (Tr. 415). Following the radiofrequency ablation, Plaintiff reported to Dr. Cha, in June 2017, that his "axial" pain was stable, but he was experiencing radicular symptoms and persistent functional limitations due to the back pain (Tr. 412). On exam, he had moderate-to-severe pain with flexion and extension of the lumbar spine (Tr. 412). Dr. Cha stated that Plaintiff had significant recurrence of discogenic/radicular pain along a dermatomal distribution that was the same or similar to symptoms experienced so new diagnostic imaging was not necessary. He also noted that Plaintiff responded to epidural steroid injections at least temporarily and recommended a repeat injection (Tr. 413).

In September 2017, NP Nelson noted lumbar spine abnormalities on examination with a positive straight leg, a reduced range of motion, and reduced strength (Tr. 521). At a visit with Dr. Cha on September 27, 2017, Plaintiff had moderate to severe pain with flexion and extension

of the lumbar spine (Tr. 506). Dr. Cha noted that a lumbar epidural steroid injection had been cancelled due to an episode of high blood pressure and it needed to be rescheduled to address Plaintiff's persistent lower back pain with radiating symptoms down the legs. Plaintiff's multiple pain medications (including narcotic analgesics) were not controlling his pain, but his doctors could not prescribe higher dosages or additional drugs (Tr. 507).

Dr. Cha administered another lumbar interlaminar epidural on November 6, 2017 (Tr. 522-24). In the last treatment in the record, from December 2017, Dr. Cha stated that Plaintiff achieved moderate relief from the recent procedure and his pain was reduced to a "7 /10," but the results were short-lived (Tr. 527). Plaintiff's pain again increased, and at the time of the appointment, his "symptoms are essentially unchanged from prior to the injection." On physical examination, Plaintiff exhibited moderate to severe pain with flexion and extension of the lumbar spine and the SLR was positive. The diagnoses remained lumbar spondylosis, lumbar degenerative disc disease, displacement of lumbar intervertebral disc, lumbar stenosis, and long-term use of other medications (Tr. 527). Further injections were planned in light of Plaintiff's persistent, severe chronic pain and failure to respond to treatment (Tr. 528). Dr. Cha noted that Plaintiff suffered severe functional limitations at times due to his pain (Tr. 528).

On March 23, 2015, Plaintiff presented for a consultative psychological examination with Victor P. Rini, Psy.D., (Tr. 291-93). He reported performing personal care independently and maintaining hygiene, but he estimated that he stayed in bed for most of the day four days each week due to fatigue (Tr. 292-93). He did not do any cooking, cleaning, or laundering of clothing and he occasionally accompanied his girlfriend on grocery shopping trips. He had no leisure time interests. Dr. Rini noted few clinical observations and diagnosed an adjustment disorder with

depression (Tr. 293).

On March 26, 2015, Plaintiff participated in a consultative physical examination with Bharat Pithadia, M.D., (Tr. 294-98). Dr. Pithadia noted a negative SLR and a positive Tinel's sign. He observed that Plaintiff used his arms to support his back during some postural maneuvers and had weakness in his right hand on objective testing. He described Plaintiff as being in "some distress." Dr. Pithadia also commented on Plaintiff's mental health stating that he had some concrete thinking and he was unable to recite the months of the year backwards (Tr. 295-96). He offered no specific opinion of Plaintiff's ability to perform work functions.

Initially, the psychologist and medical doctor who reviewed the case on behalf of the state agency determined that Plaintiff's physical and mental impairments were medically determinable but not severe (Tr. 116, 113-119, 133-136). On reconsideration, the state agency psychologist concluded that Plaintiff had mild restrictions of activities of daily living and mild difficulties in maintaining concentration, persistence or pace and no difficulties in maintaining social functioning and no episodes of decompensation of extended duration (Tr. 125-26). Accordingly, his affective disorder was found to be not severe. The medical doctor believed Plaintiff's CTS, DDD, and arthritis were severe impairments but his "Disorders of Gastrointestinal System" were not (Tr. 125). In light of his severe impairments, the state agency determined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand/walk 6 hours of an eight-hour work day, and sit for 6 hours of an eight-hour work day, and had additional postural and environmental limitations (Tr. 128). He could frequently climb ramps/stairs, kneel, balance, stoop, crouch, and crawl and occasionally climb ladders, ropes, or scaffolds (Tr. 128). The state agency also believed he needed to avoid concentrated exposure to vibration (Tr. 129).

Treating physician Dr. Kota completed a "Physical RFC Assessment" on September 14, 2017 (Tr. 498-504). The assessment addressed Plaintiff's diagnosis of compensated cirrhosis and fibrosis stage F4 (Tr. 499). Dr. Kota noted that Plaintiff finished treatment for Hepatitis C in July 2017, and his symptoms included chronic fatigue, hot/cold spells, nausea/vomiting, and flu-like symptoms (Tr. 499). He stated that Plaintiff's impairment was not expected to last more than 12 months and that depression and mental health symptoms contributed to the severity of Plaintiff's limitations (Tr. 499-500). Dr. Kota opined that Plaintiff could sit, stand or walk about four hours total in an eight-hour day (Tr. 500).

Dr. Matthews and NP Nelson submitted a Medical Source Statement dated September 12, 2017, describing Plaintiff's limitations caused by carpal tunnel syndrome, fatigue, hepatitis C virus, lumbago, scoliosis, arthritis, and cirrhosis (Tr. 509-17). In the functional capacity statement, the treating sources stated that Plaintiff could sit for fifteen (15) minutes continuously before needing to change positions by walking around for less than fifteen (15) minutes and that the total time he could sit in an eight (8) hour period was limited to three (3) hours (Tr. 509-11). Similarly, standing was limited to fifteen (15) minutes continuously, and his total standing was limited to less than three (3) hours. He needed to lie down or recline for short periods of time after standing, and he required breaks in addition to those normally scheduled to relieve pain and fatigue (Tr. 512-13). He could constantly lift 1-5 pounds, occasionally lift 6-20 pounds, and never lift 21-50 pounds (Tr. 514). He could occasionally stoop and finger but never handle (Tr. 514-15). Due to the variable nature of his impairments and the propensity for good and bad days, the treating sources believed Plaintiff was likely to be absent from a job about three times per month on average (Tr. 515). In response to a question asking the treating sources to identify "positive

objective signs" supporting their opinions, the following signs and symptoms were listed: reduced range of motion and unable to flex the back, reduced grip strength, impaired sleep, back tenderness and crepitus, muscle weakness, and positive straight leg raising test (Tr. 510).

In support of remand, Plaintiff first argues that the ALJ failed to properly evaluate his symptoms and limitations. "[A]n ALJ must adequately explain [her] credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry*, 580 F.3d at 477); Social Security Ruling (SSR) 16-3p (Mar. 28, 2016). "Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you . . . report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled." 20 C.F.R. § 404.1529(c)(3). *See also* 20 C.F.R. § 404.1529(c)(4) ("Your symptoms . . . will be determined to diminish your capacity for basic work activities to the extent [they] can reasonably be accepted as consistent with the . . . evidence."). Plaintiff argues that a review of the ALJ's decision reveals that she did not properly weigh the evidence or correctly apply the law in determining whether Plaintiff's description of his symptoms and limitations was "reasonably consistent" with the record as a whole. *See, e.g., Lambert v. Berryhill*, No. 17-1627 (7th Cir. July 19, 2018) (citing multiple cases).

The ALJ's analysis of Plaintiff's symptoms and limitations is framed in the familiar boilerplate found in nearly every unfavorable ALJ decision issued by SSA. *See Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012); *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011). Plaintiff contends that, while the evidence confirms the ALJ's conclusion that Plaintiff has

impairments that could reasonably be expected to cause his symptoms, the ALJ's decision fails to explain (and the record fails to show) why she did not believe the symptoms were as intense, persistent, or limiting as he said they were (Tr. 19). The ALJ's entire analysis of Plaintiff's credibility is as follows:

> As for activities of daily living, the claimant testified that he does some of the chores, including sweeping and blowing the leaves. The claimant stated that he will go to the store at times with his girlfriend. The claimant indicated that he goes fishing a couple of times a week (Hearing Testimony). In the Function Report, the claimant noted that he had no issues taking care of his own personal needs. The claimant stated that he could handle the chores but it just took longer. The claimant indicated that he hunted and fished at times for a couple of hours (Exhibit 3E). The claimant admitted to increased functional capacity with the injections and blocks (Exhibits 9F/3-5, 13F/7-9, 12-14, 21F).
>
> As for course of treatment, the claimant testified that he has difficulty performing certain activities with his hands but that he can hold objects better by the end of the day (Hearing Testimony). The record shows that the claimant's EMG was consistent with only very mild CTS, and there has been no specific care for it (Exhibit 6F/44-45).
>
> At the hearing, the claimant testified that he had fatigue prior to getting treatment for Hepatitis C (Hearing Testimony). The record showed very minimal complaints of fatigue, and Dr. Pithadia did not mention the claimant having any decreased energy at the consultative examination (Exhibits 1F, 2F, 3F/5-9). The claimant stated that he has increased back pain with heavy lifting, bending, and prolonged sitting/standing (Hearing Testimony). Yet, the claimant admitted to significant improvement in his pain with often resolution of his radicular symptoms with injections and medication (Exhibits 2F, 9F/3-5, 13F/7-9, 12-14, 21F). The claimant had fairly normal examinations with no neurologic deficits (Exhibits 9F/3-5, 13F/7-9, 12-14, 29-30, 32-33).

(Tr. 19). Plaintiff contends that this explanation for denying disability benefits is factually incorrect and legally insufficient for a number of reasons.

First, Plaintiff argues that the ALJ's explanation contains several factual errors, misstatements, or mischaracterizations. "The ALJ must evaluate the record fairly" and build an "accurate and logical bridge" from the evidence to his conclusion regarding a claimant's RFC.

*Golembiewski v. Barnhart*, 322 F.3d at 917; *Craft*, 539 F.3d at 673. When the ALJ

mischaracterizes significant evidence, the ALJ's reasoning does not build an "accurate and logical

bridge" from the evidence to the conclusion. *See Roddy v. Astrue*, 705 F.3d 631, 637-38 (7th Cir.

2013)(reversing where ALJ "misunderstood or mischaracterized the results of the MRI"); *Steele,*

290 F.3d at 938, 940 (error where ALJ mischaracterized EEG results); *see also, e.g.*, *Charles B. v.*

*Saul*, Case No. 18 C 1377, at *12 (N.D. Ill. Aug. 1, 2019) (ALJ erred, inter alia, in characterizing

imaging results as "mild")

Second, Plaintiff argues that, while the ALJ listed Plaintiff's activities of daily living

(ADL), she did not explain how those activities equated to the ability to sustain a full-time job.

The substantial evidence standard requires the ALJ to build a logical bridge between the evidence

and her credibility finding. *Pepper*, 712 F.3d at 362. While this standard does not require an ALJ

to evaluate every item of evidence in the record, it does require that she grapple with evidence

that may run counter to her conclusion, and cherry picking only the favorable evidence is not

sufficient. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)("The ALJ must confront the

evidence that does not support [her] conclusion and explain why that evidence was rejected.").

Here, Plaintiff points out that the ALJ did not mention evidence from an SSA employee who

noted Plaintiff was lethargic and had difficulty concentrating during an interview or discuss how

that weighed against the evidence she did mention (Tr. 218, 237, 265). She did not contrast

reports of Plaintiff's problems with fatigue and having multiple bad days per week with his

occasional ability to engage in recreational activities (Tr. 226, 242-43). She also failed to consider

the assistance he received from family that permitted him to function as he described (Tr. 228-30,

242-43). Plaintiff concludes that the logical bridge is missing in this case.

Plaintiff also points out that nothing in the ALJ's account of Plaintiff's ADLs is inconsistent with light exertional level work. Plaintiff notes that many of the ALJ's "factual" findings tend to support the conclusion that Plaintiff functions at the light level at best (even assuming the ALJ's version of the facts is correct). The ALJ did not explain why the facts she cited support any particular conclusion, but Plaintiff notes that a light RFC findings would have required a finding of disability. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2 § 202.06.

Plaintiff argues that the ALJ's reasoning also contravenes SSR 16-3p's admonition that adjudicators must limit their assessment to focusing on how "the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities" and a generalized evaluation of whether the claimant is worthy of belief. If the ALJ was pointing out Plaintiff's rather mundane ADLs to suggest he was being dishonest or less than forthcoming about his functioning, SSR 16-3p clearly prohibits ALJs from wading into judgments about a claimant's propensity for truthfulness based on how well the ALJ believes their symptoms match the activities and other evidence. Instead, SSA policy confines the inquiry to consideration of what the evidence shows about the claimant's functioning. SSR 16-3p.

Additionally, the ALJ failed to recognize "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as [he] would be by an employer." *Bjornson*, 671 F.3d at 644-45; *Roddy*, 705 F.3d at 637 ("[N]o employer is likely to hire a person who must stop working and lie down two to three times a day for an hour at a time, or who requires multiple days to complete tasks other employees might finish in one workday." (citation omitted)). The Seventh Circuit and the district

courts within this circuit have consistently agreed that "normal" activities or even sporadic attempts at more ambitious activities are not consistent with the ability to maintain consistent functioning in the workplace. *See, e.g., Hudnall v. Comm'r of Soc. Sec.*, No. 1:16-cv-00092-SLC, at *28 (N.D. Ind. Aug. 9, 2017) (error where ALJ "seized upon" playing pool on one occasion, helping move furniture on one occasion, and taking several car trips out of state to see his ill parents); *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (going on vacation not inconsistent with physical limitation); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (caring for children was "heroic efforts", not inconsistency); *Roddy*, 705 F.3d at 637 (part-time work did not preclude establishing disability). Further, the ALJ failed to explain how the listed daily activities are inconsistent with Plaintiff's complaints of disabling back pain and fatigue and the inconsistency cannot be implied or assumed. *See Engstrand v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015) (finding that the claimant's driving his family to work and activities, and his helping with seated tasks on the family farm, was not inconsistent with being unable to engage in substantial gainful activity); *Ramey v. Astrue*, 319 F. App'x 426, 430 (7th Cir. 2009) (opining that the claimant's minimal daily activities, which included two hours of house chores punctuated with rest, cooking simple meals, and grocery shopping three times a month, were not inconsistent with her claims of disabling pain).

Further, as Plaintiff notes, the logical bridge is missing here because the ALJ simply did not grapple with much of the evidence in any meaningful way. *See, e.g., Amber S. v. Berryhill*, Cause No. 1: 17-cv-3966-WTL-MPB (S.D. Ind. Oct. 23, 2018). While the decision contains a summary of some of the evidence in the transcript and some additional "analysis" relating to the opinion evidence, summarizing the evidence is not a substitute for analysis. *Young v. Sec'y of*

*Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992). *See, e.g., Dixon v. Colvin*, Cause No.: 2:12-cv-464-PRC, at *11 (N.D. Ind. Mar. 7, 2014).

Third, Plaintiff argues that the ALJ claimed that Plaintiff "admitted to increased functional capacity with the injections and blocks" (Tr. 19). As Plaintiff notes, this statement is simply incorrect. The evidence cited by the ALJ on pages 3-5 of exhibit 9F (Tr. 392-95), shows that in December 2015, after an injection, Plaintiff's pain was a 5/10 (which was, admittedly, better than before), he displayed significant pain with ROM maneuvers, and he was scheduled for another injection (Tr. 395). Further, the ALJ did not mention that one month later, in January 2016, Dr. Cha noted that the lumbar epidural steroid injection resulted in only moderate improvement and Plaintiff continued to have persistent chronic pain in his lumbar spine and moderate-to-severe pain with flexion and extension of the lumbar spine that caused pain and severe functional limitations (Tr. 406). A diagnostic lumbar medial branch block was recommended because Plaintiff had "failed to respond to any therapy that has been done [and i]t is unlikely that he will continue to achieve any relief with the therapy which was recommended by his insurance," and Dr. Cha added MS Contin for breakthrough pain not controlled by other narcotic medications (Tr. 407).

Contrary to the ALJ's assertion, Exhibit 13F/7-9 (Tr. 417-18) indicates that the injection worked for only one to two hours before Plaintiff's pain and dysfunction returned to baseline. And the severity of his pain is evidenced by the prescription for Norco and tramadol (Tr. 417-18). Similarly, on pages 12-14 of Exhibit 13F, it's reported that the injection provided only six hours of relief, and Plaintiff's Percocet was increased (Tr. 422-23). In Exhibit 21F, Dr. Cha called the effects of the injections "short-lived" and explained that Plaintiff achieved only moderate relief

before returning to baseline (Tr. 526-28).

Likewise, the ALJ cited the lack of neurologic deficits in the record but failed to note the repeated instances of Plaintiff exhibiting a positive SLR and radicular symptoms (Tr. 320, 383, 521, 527). Inclusion of this additional evidence paints a different picture of the effectiveness of treatment on Plaintiff's pain and ability to function. *See, e.g., Garth v. Berryhill*, Cause No. 2: 16-CV-428-PRC (N.D. Ind. Oct. 26, 2018) ("The evidence cited and not cited by the ALJ regarding Plaintiff's carpel tunnel syndrome is troubling."). Despite the evidence showing very brief improvement, the ALJ did not explain how this evidence supported her finding that Plaintiff could sustain medium exertional level activity.

Fourth, Plaintiff argues that the ALJ's paragraph referring to course of treatment does not make sense, and therefore, cannot be considered a logical bridge supporting the ALJ's conclusion. In fact, the record shows that Plaintiff's actual course of treatment has included use of a TENS unit, narcotic pain medication, antidepressant medication, antiviral medication, spinal injections, physical therapy, and chiropractor treatments. This level of treatment is consistent treatment with his conditions and limitations. The ALJ did not explain why she thought otherwise or how the "course of treatment" supported her findings.

To the extent the ALJ intended to discount allegations of handling and fingering limitations, she did not create a logical bridge or offer sufficient rationale to connect the evidence and the (missing) conclusion. Further, the ALJ failed to consider that Plaintiff's upper extremity complaints might be attributable to a condition other than carpal tunnel, and she neglected her duty under agency policy to figure out whether Plaintiff was describing a disability neither he nor she was able to diagnose. Plaintiff testified that the pain in his arms, in fact, extended from his

shoulders to his wrists, and notably, he was repeatedly observed by his chiropractor to have an abnormal posture with a "forward head" and a "protracted shoulder" (Tr. 76, 404-05, 408-10, 444-47, 449). Program Operations Manual System (POMS) DI 24505.030 explains that claimants do not always identify an impairment on which disability can be found and the record may contain evidence suggesting the existence of a disabling impairment that requires further development. The POMS specifically says, "For example, a potential impairment may be detected from a mere reference to a symptom or a limitation, but there is insufficient documentation in file to determine relevance to the disability determination or if further evidence development is necessary." POMS DI 24505.030. The POMS parallels case law describing the ALJ's independent duty to fully and fairly develop the record which is not eliminated when a claimant has counsel. *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014); *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). Here, the ALJ failed to recognize the need to find out whether Plaintiff's symptoms and the observations of the chiropractor provided an explanation for his limitations, and she neglected to gather enough evidence to make a fair decision about whether the limitations he described were real.

Fifth, Plaintiff argues that the ALJ claimed that the record contained minimal complaints of fatigue (Tr. 19). Clearly, however, the record is replete with Plaintiff's reports to various doctors of tiredness and fatigue (Tr. 294, 299, 300, 303-04, 306-07, 310, 386-87, 457, 461, 465, 467, 471). And, contrary to the ALJ's assertion, Plaintiff told the consultative examiner about his fatigue (Tr. 291-92). And, Plaintiff's treating doctors reported that fatigue was a factor in his inability to work (Tr. 499, 513). Again, the ALJ's factual error prevented the creation of any potential logical bridge between the evidence and her conclusion which resulted in a legally

flawed decision.

Additionally, although the ALJ mentioned the third-party reports from Plaintiff's girlfriend, her consideration of this important evidence is contrary to the guidance of SSRs 16-3p, and her decision to give it little weight is not supported by the evidence. The ALJ cited "inconsistency" with the other evidence as the reason for discounting the weight attributable to the girlfriend's statements (Tr. 21). However, she cited no evidence in support of her finding and did not explain what was inconsistent about Plaintiff's girlfriend's description of Plaintiff's limitations. In fact, the witness's report dovetails with reports Plaintiff made to his providers and SSA and with his testimony. The ALJ at least partially acknowledged that the report had some value in saying she was giving it "some weight," but she failed to honor her statement by incorporating limitations in the RFC reflective of the girlfriend's report or explaining how the report factored into her assessment. Clearly, the ALJ's failure to properly evaluate this evidence is harmful error.

While the substantial evidence standard does not require an ALJ to evaluate every item of evidence in the record, it does require that she grapple with evidence that may run counter to her conclusion; citation of only the evidence favorable to her conclusion is not sufficient. *See Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support [his] conclusion and explain why that evidence was rejected."). In the present case, the logical bridge is missing because the ALJ merely juxtaposed her conclusions with isolated "supporting" facts without providing connecting rationale. The resulting conclusions cannot be said to be supported by substantial evidence because the decision lacks meaningful analysis of the evidence supporting Plaintiff's disability.

In response, regarding the ALJ's evaluation of Plaintiff's symptoms and limitations, the Commissioner argues three logically inconsistent theories of why the ALJ did not violate SSR 16-3p. First, the Commissioner claims Plaintiff's argument is irrelevant. Essentially, the Commissioner asks the Court to disregard the ALJ's resort to a general evaluation of Plaintiff's "credibility" because the ALJ did not call Plaintiff untruthful and, instead, used euphemisms couched in regulatory language. The Commissioner's response confounds the ALJ's regulatory obligation to determine whether specific allegations can be accepted as reasonably consistent with the record with a similar sounding but impermissible finding that Plaintiff's overall allegations are "inconsistent" with the overall record. The latter is clearly prohibited by SSR 16-3p which states it is not sufficient for an adjudicator to allude to the regulatory factors, make conclusory statements about facts supporting a forgone conclusion against the claimant, and make generalized conclusions that "the individual's statements about his or her symptoms have been considered" and "the statements about the individual's symptoms are (or are not) supported or consistent." SSR 16-3p. In contrast, the ruling clearly requires articulation of "specific reasons for the weight given to the individual's symptoms" that are "consistent with and supported by the evidence" with conclusions directly related to the symptoms and limitations the individual alleged.

The Commissioner further argues that the ALJ's "analysis" of Plaintiff's symptoms and limitations was both specific enough to avoid violating SSR 16-3p's prohibition against overly broad conclusions about specific symptoms and limitations based on generalizations about consistency and general enough that it was not intended to demonstrate the ability to perform any particular work-related activity. The Commissioner specifically admits that the "ALJ's analysis

29

concerns the reliability of Plaintiff's allegations that his subjective symptoms were extreme and disabling" and that "the point was not that Plaintiff's activities demonstrated an ability to work; rather, those activities (and other factors) were inconsistent with Plaintiff's allegations that his symptoms were extreme and disabling." Thus it appears that the ALJ did not think Plaintiff's story sounded like the truth so she disregarded the specific difficulties Plaintiff described having instead of looking at specific symptoms and limitations and determining whether each one could reasonably be accepted as consistent with the medical and other evidence. Clearly, the ALJ erred by departing from SSA's policy and employing the wrong analysis of Plaintiff's symptoms and limitations. SSR 16-3p.

Contrary to the Commissioner's assertion, the ALJ's decision contains a boilerplate "credibility" finding, an abbreviated and one-sided evidentiary summary, and only a few paragraphs rejecting Plaintiff's application for benefits. (Tr. 17-20). The Seventh Circuit has conclusively determined that the boilerplate itself is useless, and the evidentiary summary cannot substitute for the lacking analysis. *Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018); *Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992). A logical bridge (and evidentiary basis) is missing, and the Commissioner's post hoc supplementation cannot supply reasons for upholding the ALJ's decision. *See Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)("[T]he ALJ did not rely on this rationale in his opinion, so the Commissioner cannot now rely on it."); *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) ("Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace."); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) ("We confine our review to the rationale offered by the ALJ");

*Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) ("But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here"). Thus, remand is warranted on this issue.

Next, Plaintiff argues that the ALJ erred in evaluating the opinion evidence. Plaintiff claims that the ALJ did not give appropriate deference to the opinions offered by Plaintiff's treating sources (Tr. 19). An ALJ must give "controlling weight" to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence," 20 C.F.R. § 404.1527(d)(2); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (per curiam). SSR 96-2p3 reminds ALJs that even if "a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record" it is "still entitled to deference" and in many cases, "a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."

The ALJ's analysis of the treating source medical opinions encompasses only two paragraphs and includes the following rationale:

> I give some weight to the opinion of Dr. Kota, as it is somewhat consistent with the residual functional capacity. I do not find that the claimant requires further standing, walking or sitting limitations, as he had improvement in his back pain with injections and medication along with no neurological deficits (Exhibits 2F, 9F/3-5, 13F/7-9, 12-14, 29-30, 32-33, 21F).

> I give little weight to [the Nelson and Matthews] opinion, as it is inconsistent with the record. I note that Ms. Nelson and Dr. Matthews even admitted that the limitations were what was reported to them by the claimant and that he would require a physical therapy evaluation in order to better evaluate his capacity (Exhibit 18F). There is nothing to support the missing work or need to lie down, as the claimant indicated that he had almost complete resolution of his pain with his medication and injections (Exhibits 2F, 9F/3-5, 13F/7-9, 12-14, 21F). There is nothing to support the manipulative restrictions, as the claimant had evidence of

very minor CTS (Exhibit 6F/44-45). (Tr. 19-20).

Plaintiff argues that in discounting every treating source opinion in the record, the ALJ failed to consider whether the opinions were entitled to controlling weight and also erroneously applied the "controlling weight" standard to determine whether to afford the opinions any significant weight in the disability evaluation. Plaintiff contends that ALJ further erred by obfuscating her reasoning by enunciating her conclusions in two short paragraphs with very little explanation. Under SSR 96-2p, stating that a treating source's opinion is "not well-supported" or is "inconsistent" with the other evidence is not sufficient. The ruling cautions that the opinion is still entitled to deference and may still be the best evidence for determining the claimant's functional ability. SSR 96-2p. The ALJ had the discretion to defer to other evidence if other evidence was legally more probative of Plaintiff's abilities but, Plaintiff argues, she failed to explain why she gave little weight to the treating source opinion of Dr. Mathews and NP Nelson and drew selectively from the opinion of Plaintiff's gastroenterologist, and also failed to explain why she generalized Dr. Kota's opinion.

Regarding Dr. Kota's opinion, the ALJ's discussion does not explain what she found persuasive or not persuasive or why she found the four-hour limitation inconsistent with the residual effects of Hepatitis and cirrhosis. To the extent she intended to discount Dr. Kota's opinion based on the statement about supposed improvement in Plaintiff's back pain, the ALJ's logic is a non sequitur because improvement in back pain is irrelevant to the effects of Hepatitis. And again, as discussed above, the ALJ is simply wrong about the "improvement." Despite her statements, the ALJ failed to give legally sufficient or factually supported reasons for discounting Dr. Kota's opinion that Plaintiff could sit, stand, or walk about four hours total in an eight-hour

day (Tr. 500).

As for Dr. Matthews and NP Nelson's Medical Source Statement, the ALJ said it was "inconsistent with the record" and that the providers "even admitted" they relied on their patient for information. However, doctors are permitted to rely on what their patients tell them. While case law suggests that an ALJ may reject a treating source's opinion to the extent it is based solely on a patient's subjective reports, *see Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) ("[I]f the treating physician's opinion is . . . based solely on the patient's subjective complaints, the ALJ may discount it."), the ALJ misapplied that concept in this case. As noted by the Seventh Circuit, a medical opinion loses persuasiveness when it is based on reports from a claimant that can "not be explained by the objective medical evidence." *Aurand v. Colvin*, 654 F.App'x 831, 837 (7th Cir. 2016) (unpublished) (citing *Dixon*, 270 F.3d at 1178). That is not the case here.

Plaintiff has medical conditions that explain his symptoms. The ALJ found Plaintiff had conditions that explained his symptoms when she stated, "I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms" (Tr. 19). His doctors also identified the conditions underlying their opinions, and the ALJ offered no reason to disbelieve their conclusion that those conditions caused the stated limitations (Tr. 500-17).

And, contrary to the ALJ's description of the treating sources' opinion being based entirely on Plaintiff's reports, the providers identified "positive objective signs" supporting their opinions that the ALJ neglected to mention (Tr. 510). Even without the specific identification of "signs" in the opinion, the record itself demonstrates that the providers were well aware of the

clinical and objective evidence of Plaintiff's conditions (Tr. 299-312, 386-89, 456-97, 505-08, 518-21). The Seventh Circuit has cautioned that patient complaints of "physical pain often cannot be explained through diagnostics," and that it is "illogical to dismiss the professional opinion of an examining [physician] simply because that opinion draws from the claimant's reported symptoms." *Aurand*, 654 F.App'x at 837. In fact, "[a]lmost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion." *McClinton v. Astrue*, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012).

Plaintiff argues that the ALJ further erred in faulting the providers for acknowledging that their opinions were based in part on Plaintiff's description of the impact his conditions had on his ability to function and their suggestion that consultation with a physical therapist might yield additional helpful information. The providers obviously were able to communicate any reservations or concerns they had about commenting on Plaintiff's functioning, and all they had to say was that he told them how his conditions affected him and they thought further evaluation by someone trained to administer functional evaluations might be helpful. Nothing in those comments detracts from their opinions or suggests that the opinions they offered were wrong or skewed in Plaintiff's favor. Notably missing from the providers' report is any suggestion that Plaintiff's description of his functional limitations was disproportionate to the severity of his medical conditions. Notably missing from the ALJ's decision is any evidence that the treating source opinion reflects an uncritical or unexamined acceptance of Plaintiff's reports and not proper consideration of both the objective/clinical medical data and his statements. Thus, the ALJ failed to build an accurate and logical bridge from the evidence to her conclusion. *Beardsley v.*

*Colvin*, 758 F.3d 834 (7th Cir. 2014); *see also, e.g., Ritchie v. Colvin*, No. 14 C 499, at *16-18

(N.D. Ill. Dec. 16, 2016) (unpublished).

Further, the ALJ did not confront and explain why the "positive objective signs"

supporting the opinion - including reduced range of motion and unable to flex the back, reduced

grip strength, impaired sleep, back tenderness and crepitus, muscle weakness, and positive

straight leg raising test – were not persuasive (Tr. 510). She failed to explain why the MRI

showing mild to moderate degenerative spondylosis, a tiny central disc protrusion with moderate

to severe bilateral facet arthrosis at L4-L5, and moderate bilateral facet arthrosis at L5-S1 (Tr.

345) that the pain management team called significant multilevel degenerative disc disease and

moderate multi-level degenerative joint disease (Tr. 315) failed to support the opinions. She did

not mention the chiropractors, repeated observations of Plaintiff having an abnormal "forward

head" posture and a "protracted shoulder" (Tr. 404-05, 408-10, 444-47, 449). "Although the ALJ

need not discuss every piece of evidence in the record, [s]he must confront the evidence that does

not support [her] conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d

470, 474 (7th Cir. 2004).

As for her statement that "nothing" supports the manipulative restrictions, this statement

is contradicted by her own finding of manipulative limitations and reflects only that she believed

she was more qualified to interpret the EMG and clinical signs than was Plaintiff's doctors (Tr.

19-20). The ALJ does not have the medical training necessary to interpret medical testing to

determine what functional limitations would result. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th

Cir. 2014) (finding that the ALJ played doctor, "a clear no-no" (citing *Blakes ex rel. Wolfe v.

Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Rohan v. Chater*, 98 F.3d 966, 90 (7th Cir. 1996).

Further, while the ALJ may not have agreed with the way the treating sources interpreted the clinical findings, they were in a much better position to determine the meaning of the objective and clinical evidence than was the ALJ. *See Clifford*, 227 F.3d at 870-71. The ALJ's substitution of her judgment for that of the treating sources is contrary to the law. The ALJ's failure to apply the correct legal standards in weighing the opinion evidence is legal error and remand is required.

Next, Plaintiff argues that the vocational findings are founded upon legal error and not supported by substantial evidence. Plaintiff claims that the ALJ erroneously found that Plaintiff could perform the mental and physical demands of his past relevant work (PRW) as a tool and die maker without engaging in the analysis required by the regulations (Tr. 20). *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir.2005); *Clifford*, 227 F.3d at 872. At step four, the ALJ must determine whether the claimant has any past work that is relevant and if so, whether s/he can perform that work with the RFC supported by the record. *See* 20 C.F.R. § 404.1565(a); SSR 82-62. Having determined that the job as a tool and die maker was Plaintiff's only PRW, the ALJ was required to make specific findings of fact regarding the physical and mental demands of that job both as Plaintiff performed it and as the job was generally performed in the national economy. *See* 20 C.F.R. § 404.1565(a). The importance of the step four analysis cannot be overstated. SSR 82-62 explains, "The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision." The SSR goes on to instruct adjudicators that "[t]he rationale for a disability decision must be written so that a clear picture of the case can be obtained. The rationale must follow an orderly pattern and show clearly how specific evidence leads to a conclusion." SSR 82-62. Plaintiff points out that the rationale

described in SSR 82-62 is absent from the ALJ's decision. Rather, the ALJ devoted one sentence to the VE testimony and summarily concluded that Plaintiff's RFC did not preclude performance of his PRW (Tr. 20).

The ALJ must make the administrative findings at step four based on the evidence and the applicable law and not defer uncritically to a VE's conclusion. *See* SSR 82-62. Here, the ALJ over-relied on the vocational expert (VE) and failed to adequately consider the evidence or properly apply the law. In fact, the ALJ not only failed to adequately consider the evidence, she failed to adequately develop the evidence. SSR 82-62 states that "every effort must be made to secure evidence" about the PRW and the record must contain detailed information about "strength, endurance, manipulative ability, mental demands and other job requirements" derived from a detailed description of the work including the "tools and machines used, knowledge required, the extent of supervision and independent judgment required, and a description of tasks and responsibilities." Here, Plaintiff described his PRW on a 2015 form submitted to SSA wherein he stated that he worked in various labor positions running a manual lathe machine where he was required to mostly stand, lift 100 pounds or more occasionally, and frequently lift 50 pounds or more (Tr. 222-23). The only other information was his testimony at the hearing where he said he worked as a tool and die maker running a manual lathe, and depending on the task required, some days he stood all day while other days he sat part of the time (Tr. 78-79). He estimated that he lifted 40 to 50 pounds and occasionally a "big die" (Tr. 78).

The ALJ called upon a vocational expert (VE) to testify about jobs and the impact of certain limitations on a person's ability to perform jobs that exist in significant numbers in the national economy, but she did not ask about the specifics of Plaintiff's PRW (Tr. 102-09). The

VE categorized Plaintiff's past work as a tool and die maker as a medium exertional level job performed at the skilled (SVP 8) level (Tr. 101-03). The ALJ did not ask about the specific requirements of the job or the differences between how Plaintiff performed job and how it was generally performed. In response to various hypothetical questions, the VE offered his opinion of whether a person with certain limitations could perform the job either as Plaintiff performed it or as it is described in the Dictionary of Occupational Titles (DOT) (Tr. 103-06). The VE testified that an individual capable of medium work who could never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; and occasionally balance, stoop, kneel, crouch, and crawl; could tolerate no concentrated exposure to vibration; and could frequently handle and finger bilaterally could perform Plaintiff's past PRW both as he performed and as described in the DOT (Tr. 102-03). Occasional handling and fingering eliminated jobs (including the PRW) at the medium exertional level and reduced the light occupational base to one job (Tr. 103). Even if Plaintiff could perform the full range of light work, the skills acquired in his past work would not transfer, according to the VE (Tr. 103-04). Limitations precluding all work activity included being off task more than 20% of the workday and two to three absences per month (Tr. 103-05).

Plaintiff points out that the ALJ's decision refers to the VE's testimony but does not describe the requirements of Plaintiff's PRW with any detail and only minimally summarizes the VE testimony (Tr. 20). Obviously, without a detailed description of the PRW as a starting point, the ALJ was unable to engage in the required function-by-function comparison of Plaintiff's PRW with his RFC.

Further, the ALJ did not discuss what evidence supported her finding that Plaintiff was able to perform the tasks described in the RFC and hypothetical or offer valid reasons for

discounting Plaintiff's explanation for being unable to perform the job due to his multiple medical conditions. Plaintiff argues that the ALJ's legal error in failing to engage in the proper RFC analysis prevented a legally sound evaluation of Plaintiff's ability to perform his PRW because a function-by-function analysis was not possible without a legally sound RFC. *See* SSR 82-62; POMS DI 25005.020, 25005.050.

Plaintiff contends that, had the ALJ properly formulated Plaintiff's RFC and engaged in a proper analysis of his PRW, she would have concluded that he could not perform the requirements of his PRW. Limitations on continuous standing, frequent lifting, frequent handling, exposure to hazardous machinery, and sustained concentration would preclude performance of Plaintiff's past work according to the descriptions of the job given by the VE and the DOT. (Tr. 101-03). The same limitations would also eliminate other jobs at the medium exertional level, and according to the VE, there would be no transferable skills to the light exertional level (Tr. 103). If Plaintiff was limited to light work, he would be presumptively disabled pursuant to Grid Rule 202.06 (20 C.F.R. Part 404, Subpart P, Appendix 2).

Even if the ALJ's finding was somehow supported by the record, Plaintiff claims that the ALJ erred by failing to consider whether Plaintiff can perform the "mental" aspects of his highly skilled PRW. The Commissioner's regulations and Seventh Circuit precedent instruct that all limitations, even those that are non-severe, must be included in the RFC assessment. *See Golembiewski*, 322 F.3d at 918; 20 C.F.R. § 404.1545(a); SSR 96-8p. Therefore, regardless of whether the ALJ properly classified Plaintiff's depressive disorder as non-severe, she was required to analyze all of the medically determinable mental and physical impairments in combination, including those that are non-severe, in the RFC determination. *Yurt v. Colvin*, 758

F.3d 850, 857 (7th Cir. 2014); *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012). That did not happen in this case where the RFC contains no provisions to accommodate mental limitations. The ALJ also failed to account for the side effects of narcotic medication use.

Without knowing what the ALJ found to be the actual demands of the PRW, it is difficult to say how she concluded Plaintiff was capable of performing the mental demands of the job given his pain, depression, and use of narcotic pain medication. However, the Bureau of Labor Statistics explains that there are a number of "Important Qualities" a person must possess to work as a tool and die maker. *See* Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Machinists and Tool and Die Makers, on the Internet at https://www.bls.gov/ooh/production/machinists-and-tool-and-die-makers.htm. For example, "tool and die makers' work must be accurate" and may require "accuracy to within .0001 of an inch, a level of accuracy that requires workers' concentration and dexterity." *Id*. Another example given is "physical stamina" because workers "must stand for extended periods and perform repetitive movements." *Id*. Additionally, tool and die makers work around hazards, and they must be able to follow precautions to avoid injuries by doing things such as wearing protective equipment. *Id*. Plaintiff points out that the evidence shows that Plaintiff was noted to have concrete thinking by SSA's consultative examiner, his family observed difficulties with concentration and memory, he accidently overdosed on pain killers and lost consciousness, he reported difficulty thinking, and his doctors routinely noted fatigue (Tr. 82, 86, 265, 294, 300, 304, 325, 387, 457, 465, 471). Plaintiff concludes that this evidence alone shows that the ALJ's conclusory finding that Plaintiff could perform his hazardous, highly skilled PRW was harmful error.

Additionally, Plaintiff argues that the ALJ did not properly address whether Plaintiff had

limitations that prevented him from sustaining a 40-hour workweek. The POMS instructs adjudicators to be mindful of limitations that cannot be adequately described using the functions typically associated with an RFC finding. *See* POMS DI 24510.057 Sustainability and the Residual Functional Capacity (RFC) Assessment ("REMINDER: Inability to sustain a 40-hour workweek is an RFC finding."). Plaintiff contends that while the RFC and hypothetical questions may reflect functions Plaintiff could perform on an infrequent basis, the weight of the evidence in the record shows that he could not sustain those activities for forty hours per week. Additionally, the ALJ did not recognize that pain, medication side effects, and depressive symptoms – particularly in combination- can impact functioning. POMS DI 24510.006 requires adjudicators to consider the effects of physical impairments on mental functioning. *Id*. Therefore, the ALJ should have included limitations to account for the effects of Plaintiff's pain and any side effects from his pain medication. She should also have considered whether his pain would require additional breaks as Plaintiff testified and his doctors opined (Tr. 86-87, 512-13). The ALJ did not address sustainability, and that omission is reversible error.

In response, the Commissioner appears to acknowledge the ALJ's decision was deficient, but he argues that the Court should excuse the deficiency as a technicality. However, the Commissioner cites no authority excusing him from the Seventh Circuit's requirement that the ALJ's written decision "build an accurate and logical bridge from the evidence to [the] conclusion" and "articulate legitimate (even if minimal) justifications for the conclusions reached." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). And the harmless error doctrine is of no help where an ALJ makes a decision that is so skeletal as to prevent the claimant and the Court from understanding the basis

of her decision. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (Remand is required when the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review."). The Seventh Circuit has explained that application of the harmless error doctrine is appropriate only "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support [that] remanding is a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). *See also McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011)("[W]e look at the evidence in the record to see if we can predict with great confidence what the result on remand will be.")

As it is clear that the vocational findings are not supported by substantial evidence, remand is required.

## Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for further proceedings consistent with this Order.

Entered: January 23, 2020.

s/ William C.  Lee
William C. Lee, Judge
United States District Court